UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | No. 5:11-CR-46-KKC |
| v. | ) | |
| | ) | RECOMMENDED DISPOSITION |
| THEODORE S. LOMAN, | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*

The Court considers a Motion to Suppress filed by Defendant Theodore S. Loman. DE #28 (Motion). Alleging a Fifth Amendment/*Miranda* violation, Defendant moved to suppress statements he allegedly made to Deputy United States Marshals on March 15, 2011. *Id.* He also moved to suppress evidence seized during a search of his residence on that date based on the Fourth Amendment prohibition against warrantless searches and seizures.[1] The United States filed a Response (DE #30 (Response)), and the Court conducted an evidentiary hearing on July 11, 2011. *See* DE #37 (Minute Entry). Having reviewed the briefs and considered the testimony given and argument made at the hearing, as well as the full record, the Court **RECOMMENDS** that the District Court **DENY** Defendant's motion to suppress. On this record, no basis for

---

[1]Defendant also based his motion on Sections 10 and 11 of the Kentucky Constitution and cited case law applying those provisions. The admissibility of evidence in a federal prosecution is generally governed by "federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Elkins v. United States*, 364 U.S. 206, 223-24 (1960). Defendant has not argued that any exception to that general rule applies, and the Court therefore considers only Defendant's arguments under the Fourth and Fifth Amendments of the United States Constitution.

1

suppression exists.

I.  **Background Information**

On March 15, 2011, approximately eight Marshal's Service officers, including Deputy Marshal Roger Daniel, went to Defendant's residence to arrest Azra Basic pursuant to a warrant. DE #40, July 11, 2011, Evidentiary Hearing Transcript ("Tr."), at 5. The arrest warrant arose from war crime charges in Bosnia, including murder and torture. *Id.* at 26. Authorities learned that Basic resided at Loman's home. *Id.* at 5. Based on the nature of Basic's alleged crimes, Daniel believed Basic may have been armed and dangerous at the time they went to arrest her. *Id*. In addition, in preparing for the arrest, Daniel performed a criminal history check with respect to Defendant, which revealed Loman had a prior felony conviction. *Id.* at 23; DE #1-1, Affidavit of Deputy Marshal Roger D. Daniel ("Aff."), at ¶ 11. Daniel had also spoken with an officer in the Lexington Police Department who advised that Defendant, who has a marijuana trafficking conviction, associated with an alleged recent murderer and his alleged victims. Tr. at 31-32.

When the Marshals arrived, Defendant's wife, Lucille Loman, was standing in the driveway. *Id.* at 7. Mrs. Loman told the contingent that Basic was inside the home, along with three men. *Id*. at 8. As they approached the side door leading into the kitchen, Daniel saw Basic standing inside. *Id.* at 9. He knocked on the door, and when Basic looked in the Marshals' direction, they informed her she was under arrest. *Id.* at 9-10. Daniel then entered the house, handcuffed Basic, and reiterated that she had been arrested. *Id.* at 10.

Once Basic was in custody, Daniel observed Defendant standing in the doorway of a bedroom. *Id.* The Deputy Marshals told him to show his hands and walk toward them; although Loman did not comply initially, he eventually took a couple of steps forward and put up his

hands. *Id.* at 11; Aff. at ¶ 7. Defendant repeatedly looked over his right shoulder back into the bedroom behind him. Tr. at 11; Aff. at ¶ 7. The Deputy Marshals commanded Defendant to step down the hallway, and once he did so, they "placed him on the floor and put him in handcuffs." Tr. at 11. They then escorted him to a chair at the kitchen table. *Id*. at 12; Aff. at ¶ 7. The officers had removed Basic by that time. Tr. at 12; *id.* at 30.

Daniel testified that once Defendant was seated at the kitchen table, he and others began or continued looking for the other two men Mrs. Loman had indicated were inside the house. Tr. at 12; Aff. at ¶ 7. He recalled that Detective Schweigardt opened the doors to a closet and bathroom and indicated the areas needed to be cleared. Tr. at 36-38; *see also* Aff. at ¶ 8. Daniel cleared those rooms while Schweigardt went ahead into the bedroom from which Defendant had come. Tr. at 12, 38; *see also* Aff. at ¶ 8. Daniel testified they checked the closet, bathroom, and bedroom for "protective sweep reasons for officer safety issues because there were some other individuals, at that time we didn't know where they were." Tr. at 13.[2]

Before Daniel entered the bedroom where Loman had been standing, Schweigardt announced he found a weapon in plan view. *Id.* at 12. When Daniel joined him, Schweigardt pointed out a gun in a cabinet to the left of the bed, and Daniel saw a second firearm in plain view in the same location. *Id.* at 12-13; *see also* Aff. at ¶ 8. The gun Schweigardt initially saw was a Ruger .45 caliber pistol; the second gun was a Smith and Wesson .38 caliber pistol. Aff.

---

[2] Deputy Marshal Craig Smith, who also participated in executing the arrest warrant, had entered the house shortly after Daniel. *Id.* at 76; *id.* at 81. Smith testified that he saw one of the other two men sitting in the kitchen when he entered the house. *Id.* at 80. Smith also located the third man in the living room, which was to the right off the hallway that led to the bedroom where Defendant was standing. *Id.* at 78-80. Smith stayed in the living room with the third man, and while he was there, he could hear other Deputy Marshals ordering Defendant to come out of the room and put up his hands. *Id.* at 82.

3

at ¶ 8.

Daniel testified without contradiction that it was only after he and Detective Schweigardt cleared and exited the bedroom that they learned officers had already accounted for the other two men and secured the home. Tr. at 39; *id.* at 54-55; *id.* at 59 ("I had no idea where they were."); *id.* at 60. Daniel then went outside to speak with Mrs. Loman. Aff. at ¶ 8. He informed Mrs. Loman the Marshals had discovered two firearms in the bedroom and asked her for consent to search the property. *Id.* Mrs. Loman granted and signed a form memorializing her consent. *Id.* According to Smith, who was with Mrs. Loman at the time she granted consent to search, Mrs. Loman understood the form, and she consented voluntarily. Tr. at 71. Daniel also testified that he did not threaten Mrs. Loman. *Id.* at 24. Mrs. Loman informed the Marshals that there were additional guns inside a shed on the property. Aff. at ¶ 8.

Daniel went back inside the house and sat down at the kitchen table with Defendant. *Id.* at ¶ 9. Daniel informed Loman that Mrs. Loman had signed a form granting consent to search the property and that officers had located two firearms in the bedroom. *Id.* Without advising Defendant of his *Miranda* rights, Daniel asked Defendant if the firearms were his. *Id.* Daniel did not advise Defendant of his *Miranda* rights at that time because he "wanted to see if he would answer first." DE #29, April 20, 2011, Detention Hearing Transcript, at 28.³ Defendant refused to answer by remaining silent. Aff. at ¶ 9; Tr. at 48 ("He just stared at me.").

At that point, Daniel read Loman *Miranda* warnings from a standard card. Aff. at ¶ 9;

---

³Daniel is transparent, but the behavior is troubling. Daniel concedes that Loman was in custody at the time. Tr. at 21. The question, when posed to a known felon, plainly qualifies as custodial interrogation. Intentional questioning of a person in custody in direct disregard of *Miranda* is not an acceptable practice. *See Missouri v. Seibert*, 542 U.S. 600, 617 (2004) (plurality) (criticizing "question-first" strategy).

4

Tr. at 19. Daniel asked Defendant if he understood his rights, and Loman nodded. Tr. at 48-49; *id.* at 58; *see also* Aff. at ¶ 9 (Defendant "expressed that he understood his rights"). Daniel told Loman he knew of his record and status as a prohibited person. Aff. at ¶ 9. The Deputy then asked Loman again if the firearms were his. *Id.*[4] Defendant then responded that they were. *Id.*; Tr. at 19 ("Those guns are mine.").[5] Daniel asked Defendant whether any additional firearms were in the house, and Loman stated a third gun was in a case in the cabinet where the other two had been found. Tr. at 22; Aff. at ¶ 9. Daniel retrieved the case and discovered the third gun, a Beretta .22 caliber pistol. Aff. at ¶ 9. At no time did Daniel – or, to his knowledge, any other officer – threaten Defendant. Tr. at 23-24.

The Marshals arrested Defendant for being a convicted felon in possession of firearms in violation of 18 U.S.C. § 992(g)(1). Tr. at 23; DE #1 (Complaint). The Court filed a Complaint on March 16, 2011. *See* Complaint. The pending charges are based on the three firearms found in the cabinet in Loman's bedroom.[6] *Id.*; *see also* DE #18 (Indictment).

---

[4] At the evidentiary hearing, Daniel indicated Defendant simply offered – without being asked again – the statement that the guns were his after being advised of his *Miranda* rights. Tr. at 19.

[5] Daniel testified in the evidentiary hearing that he first asked Loman whether the guns were his and whether there were any more guns in the house *before* he obtained Mrs. Loman's consent to search the property, and Defendant refused to answer at that time. Tr. at 17-18. He testified that upon returning inside and informing Defendant that his wife had consented to a search, Loman again refused to answer his questions. *Id.* at 18-19. At that point, he testified, he *Mirandized* Defendant and re-asked the questions, and Loman answered. *Id.* at 19. On cross-examination at the evidentiary hearing, Defendant's counsel pointed out the inconsistency between Daniel's testimony and his affidavit. *Id.* at 41-42. Daniel adopted his affidavit as the accurate account. *Id.* at 44-45. This discrepancy does not bolster Daniel's credibility, but it is not of great significance. He repeatedly claimed to have asked Loman about the guns twice (*see id.* at 42, 44), and a slight misalignment in the precise chronology is not material to this analysis.

[6] Although authorities found a number of other firearms, Defendant and Mrs. Loman advised the officers those guns belonged to Mrs. Loman's brother-in-law. Tr. at 23; Aff. at ¶ 10.

Defendant, through counsel, filed the instant motion challenging the admissibility of all of his statements to Daniel because he was in custody when he made them, he was "not fully apprised of his right to remain silent," and he believed at the time that his wife was going to be left in the cold and perhaps arrested. Motion, at 3. Loman further claims the firearms seized from his home are inadmissible because the Deputy Marshals did not have a search warrant, and no exceptions to the warrant requirement apply.

## II. Firearms - Fourth Amendment Analysis

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause supported by Oath or affirmation." U.S. Const., amend. IV. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). The government bears the burden of proving by a preponderance of the evidence that an exception to the warrant requirement applies. *See, e.g.*, *United States v. Washington*, 573 F.3d 279, 286 (6th Cir. 2009) (government bears burden of proving exigent circumstances); *United States v. Davis*, 283 F. App'x 370, 373 (6th Cir. 2008) (government must show consent to search by preponderance of the evidence).

### A. Protective Sweep

Incident to an arrest, officers may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 334 (1990). "Beyond that," further search is proper only if supported by "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably

---

The Indictment does not address such weapons.

prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* The purpose of such a protective sweep is to protect the arresting officers, and it "may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335.[7]

The Court draws guidance from *United States v. Biggs*, 70 F.3d 913 (6th Cir. 1995). The defendant in *Biggs* was arrested 20-75 feet outside his motel room when he came out into the parking lot, leaving the door ajar. *Id.* at 915-16. Officers then entered the room to perform a protective sweep, at which time they discovered a gun in plain view. *Id.* at 915. Although police did not see anyone else enter the room during the two-hour surveillance period that preceded the arrest, the officers had previously received information that someone was going to meet the defendant there, and on two prior arrests, the defendant had been accompanied by someone with a firearm. *Id*. at 915-916. Those facts were held sufficient to warrant a *Buie* sweep. *Id.* at 916; *see also United States v. Stover*, 474 F.3d 904, 911-12 (6th Cir. 2007) (protective sweep justified where police identified car at residence registered to local criminal); *Perkins v. United States*, 127 F. App'x 830, 835 (6th Cir. 2005) (protective sweep justified where, although two men who officers had observed enter a residence had been arrested, a woman who had answered a phone call had not yet been located); *United States v. Taylor*, 248 F.3d 506, 512-14 (6th Cir. 2001)

---

[7]*Buie* really authorizes two sweeps. The first requires no justification but is well-cabined. For a search incident to arrest in a home, police may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *See*, *e.g.*, *United States v. Colbert*, 76 F.3d 773, 776 (6th Cir. 1996) (quoting *Buie*, 494 U.S. at 334). Second, "officers may conduct a search more pervasive" only if they can articulate facts to support the reasonable officer's belief that the area to be swept "harbors an individual posing a danger to those on the arrest scene." *Colbert*, 76 F.3d at 776. Here, the United States pursued the matter as a second-stage sweep. The testimony may have supported a first-stage justification, given the arrest in the bedroom hallway and the close relationship to the bedroom itself. Nevertheless, the Court addresses only the justification pursued at the hearing.

(considering apartment occupant's "overtly nervous behavior" in approving protective sweep).

The "articulable facts" on which the United States bases its initial search of Loman's bedroom are that (1) Defendant initially refused to show his hands and step out of the bedroom, Tr. at 11, and he repeatedly looked back into the room; (2) the officers who conducted the sweep of the bedroom had not yet found two of the three men Mrs. Loman said were inside the house; and (3) the Deputy Marshals were aware of Defendant's criminal history – including convictions, charges, and suspicions.[8] The Court finds that these facts and the rational inferences that arise from them would warrant a reasonably prudent officer in believing the bedroom may harbor an individual posing a danger. Under these circumstances, like in *Biggs*, the fact that Basic had already been arrested and removed from the home by the time the protective sweep occurred did not eliminate the safety considerations justifying the search.

Even if, as Defendant argued, Daniel and Schweigardt had known that all three men were secured when they conducted the protective sweep, that would not have rendered the protective sweep unconstitutional. In *United States v. Bass*, 315 F.3d 561 (6th Cir. 2002), a witness informed officers that a man who had fired gunshots at two other men had fled into a particular apartment. *Id.* at 563. The officers knocked on the door of that apartment, and the woman who answered told them her children and husband were inside. Officers entered the apartment without permission and commanded the husband to appear. When he emerged from the bedroom, the officers escorted him to the living room and handcuffed him. One of the officers then conducted a protective sweep and found a sawed-off shotgun. The husband was indicted

---

[8]The Court also notes that Daniel believed Basic – the original target – may have been armed and dangerous, which could reasonably support an inference that her associates or cohabitants might also be.

for knowingly possessing a firearm while he was a felon and knowingly possessing an unregistered sawed-off shotgun. He moved to suppress the shotgun, and the district court denied the motion. The Sixth Circuit affirmed, finding the protective sweep valid because when the officers arrived at the apartment, "they were not certain that [the defendant] was the shooter they were seeking[,] [t]he description of the apartment's occupants given by [the woman who answered the door] was not sufficient to make this identification, *[and] the officers had no assurance that she was either truthful or accurate*." *Id.* at 564 (emphasis added).

Like the officers in *Bass*, Daniel and Schweigardt had no assurance that Mrs. Loman's statement to them, that there were only three men in the house, was either truthful or accurate. They were justified in confirming for themselves whether there were any additional persons inside who might pose a danger to them. The Court thus finds by a preponderance of the evidence that the protective sweep was constitutional.

The Deputy Marshal knew three men (at least) were in the home, a home connected to an accused violent war criminal. Loman did not comply with instructions to emerge and show his hands. He continued to glance suspiciously into the vacated bedroom. Even after the deputies secured Loman, Daniel credibly thought the other two men were still unlocated and unsecured. He properly swept the area, including the bedroom from which Loman emerged, for additional persons.

Certainly, Smith's testimony could be viewed as *partially* contradictory to Daniel's. Smith was in the house quickly enough to overhear the confrontation with Loman, and he testified that one of the other males already was accounted for in the kitchen and another was quickly located in the living room. This may be accurate, or it may reflect a sequencing compressed over the time of the five-minute entry-to-view period. The Court notes that eight

9

members of the Marshal's office were on the ground, each perceiving a part of the event. Daniel reasonably was focused on Loman and his immediate environs. Daniel unequivocally denied seeing or knowing the status of the other males, and it is reasonable to believe that police acting under tension and with different duties, as would characterize both Daniel and Smith, may not perfectly recall the same precise setting elements in identical sequence. Daniel's testimony concerning his motivation for sweeping and understanding of the scene status is credible.

Defendant does not dispute that the Ruger and Smith and Wesson were in plain view.[9] Thus, having concluded the protective sweep was valid, the Court finds those firearms should not be suppressed.

B. Consent

The Beretta was not in plain view, and it was not discovered in the course of the protective sweep. Instead, Daniel found it after Mrs. Loman granted consent to search the residence and Defendant told Daniel its location. Neither party directly addressed the validity of Mrs. Loman's consent, but since Defendant moved to suppress *all* firearms, the Court nonetheless considers, on the record before it, whether Mrs. Loman's consent justifies discovery of the Beretta.

"The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of

---

[9]In the Sixth Circuit, "[u]nder the plain view doctrine, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).

evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006). Daniel and Smith testified that Mrs. Loman was not threatened or coerced in any manner, and she gave consent and signed the consent form voluntarily. Defendant has not argued or presented any evidence to impeach the validity of Mrs. Loman's consent. *See, e.g.*, *United States v. Taylor*, 202 F.3d 271, at *3 (6th Cir. 1999) (table) (government satisfied burden where agent testified consent was voluntary and defendant offered no evidence to the contrary). Nor is there any evidence that Defendant expressly refused to permit the search. *Cf. Randolph*, 547 U.S. at 120 (holding warrantless search based on consent by one resident is not reasonable as to a co-resident who is present and expressly refuses consent). Finally, any argument that Mrs. Loman's consent was tainted by the prior discovery of the Ruger and Smith and Wesson fails based on the validity of the protective sweep. The Court therefore finds by a preponderance of the evidence that Mrs. Loman validly consented to a full search of the residence, and the Beretta, which was discovered pursuant to that consent, is also admissible into evidence against Defendant.

**III.    Statements to the Deputy Marshals  - Fifth Amendment/*Miranda* Analysis**

A.    Requirement of *Miranda* Warnings

The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. Accordingly, prior to interrogating a suspect in custody, an officer must warn the individual:

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Without the requisite warning, any statement made will not be admissible in a subsequent trial. *Id.* ("[U]nless and until such warnings ... are

11

demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used[.]").

Defendant bears the burden of establishing that the scenario in which he made the statements invoked *Miranda*'s obligations. *United States v. Lawrence*, Nos. 88-2056, 88-2086, 88-2087, 88-2019, 88-2135, 1989 WL 153161, at *5 (6th Cir. Dec. 18, 1989); *United States v. Donaldson*, 493 F. Supp. 2d 998, 1003 (S.D. Ohio 2006). For purposes of *Miranda*, a person is "in custody" when, under the circumstances surrounding the interrogation, the person was under "'formal arrest or [experienced] restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). When determining whether custody existed, courts evaluate the "objective circumstances of the interrogation" rather than the "subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994); *Berkemer v. McCarty*, 468 U.S. 420, 421-22 ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."). The Sixth Circuit uses the following factors as guidance: "the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (citing *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003)).

The United States does not dispute that Defendant was in custody at the time Daniel questioned him about the firearms. *See* Tr. at 20-21; *id*. at 53-54. Although the questioning was brief and took place in Defendant's own home, because Loman was placed on the floor, handcuffed, and held, he was in custody. Consequently, Defendant was entitled to the

protections guaranteed by *Miranda*.

B. *Miranda* Waiver

A person may waive *Miranda* rights, "provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444. The United States bears the "great" burden of proving waiver, and "[t]he courts must presume that a defendant did not waive his rights[.]" *North Carolina v. Butler*, 441 U.S. at 369, 373 (1979); *Miranda*, 384 U.S. at 475 ("If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his [rights]."). The Government must prove waiver by a preponderance of the evidence. *United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008), *overruled on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009).

> The waiver inquiry has "two distinct dimensions":
>
> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)); *see also Butler*, 441 U.S. at 374-5 ("[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938))).

The United States has met its burden of establishing by a preponderance of the evidence that Defendant validly waived his *Miranda* rights. First, Defendant understood his rights. He initially, at least once, refused to answer Daniel's questions, suggesting he was aware already

13

that he need not respond. Daniel then read Loman his rights from a standard and compliant script, and Defendant nodded to indicate he understood those rights. *See United States v. Laurel*, 103 F. App'x 875, 1-2 (6th Cir. 2004) (understanding affirmatively indicated by "nodding, saying yes, or both"), *vacated on other grounds by Laurel v. United States*, 543 U.S. 1115 (2005); *United States v. Villegas*, 928 F.2d 512, 519 (2d Cir. 1991) (affirmative nod sufficient to acknowledge understanding); *United States v. Ul Islam*, No. Crim. 3:04-CR-305 (CFD), 2006 WL 1168015, at *6 (D. Conn. Apr. 28, 2006) (nodding sufficient to indicate understanding of *Miranda* rights). There is also evidence that Defendant has previously been charged with (and convicted of) criminal activity, which also supports that Loman was aware of his rights and the consequences of waiving them. *See Jackson v. McKee*, 525 F.3d 430, 436-37 (6th Cir. 2008) (defendant's "considerable prior experience with the criminal justice system gave him reason to know the consequences of waiving these rights"); *United States v. Redditt*, 87 F. App'x 440, 445 (6th Cir. 2003) (considering defendant's several prior arrests as factor in finding waiver was made knowingly). Thus, the Court finds Defendant possessed the "requisite level of comprehension" to waive his rights.

The government has also established by a preponderance of the evidence that Defendant voluntarily waived his rights. Depending on the facts and circumstances, including "the actions or words of the person interrogated," continuing to talk openly with officers post-warning may suggest implied waiver. *Butler*, 441 U.S. at 373; *Nichols*, 512 F.3d at 798-800 (performing implied-waiver analysis). In the Sixth Circuit, "'waiver may be clearly inferred ... when a defendant, after being properly informed of his rights and indicating that he understands them, nevertheless does nothing to invoke those rights' and speaks." *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (quoting *Nichols*, 512 F.3d at 798-99). Although Defendant did not

explicitly waive his rights, either verbally or in writing, the Court finds that Loman's decision to answer Daniel's questions, after being read and expressing his understanding of his rights, constitutes an implied waiver. The Deputy Marshals testified they did not threaten Defendant or Mrs. Loman, and there is no evidence of any coercive conduct directed toward Loman. Coercion is a requisite to involuntariness. *See Colorado v. Connelly*, 479 U.S. 157, 170-71 (1986) ("The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion.").

Because Defendant's statements were made voluntarily and after he was advised and expressed his understanding of his *Miranda* rights, the Court finds Defendant validly waived those rights.[10]

## IV. Recommendation

For the reasons discussed herein, the Court **RECOMMENDS** that the District Court **DENY** Defendant's Motion to Suppress (DE #28).

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute. As directed by § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), within fourteen days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for *de novo* consideration by the District Court. The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics. Failure to object in accordance with Rule 59(b) waives a party's right to review.

---

[10]Because Defendant did not make any statements prior to being advised of his *Miranda* rights, there is no concern, or argument from Defendant, that the pre-warning questioning tainted Defendant's post-warning statements. *Cf. Seibert*, 542 U.S. 600 (excluding confession made after *Miranda* warnings where confession had also been made during pre-warning interrogation).

15

This the 16th day of August, 2011.

Signed By:
*Robert E. Wier*  REW
**United States Magistrate Judge**